**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

| | |
|---|---|
| **KENNETH EDGE, DERRIE EDGE, and ANDREW EDGE,**<br><br>Plaintiffs,<br><br>v.<br><br>**JUSTIN KLANKE and KATHERINE KLANKE,**<br><br>Defendants. | Case Number: |

**COMPLAINT WITH JURY DEMAND**

## I. INTRODUCTION

1. This action arises from Defendants' public accusations that Plaintiffs were holding Defendants' adult daughter, Adelyn Klanke, hostage, that Plaintiffs were preventing her from communicating with her parents, and that Plaintiffs were "grooming" her. Defendants further accused the Plaintiffs of having hundreds of guns at their farm property and having a history of engaging in sexual abuse.

2. None of these statements is true nor substantially true. Adelyn was eighteen years old and voluntarily accepted temporary accommodation offered by the Edge family after a dispute with her parents. At all times, Adelyn was free to leave, and her movements and communications were never restricted by the Plaintiffs. In addition, nothing in the history or background of Plaintiffs substantiates, even in the slightest, the allegations about guns and sexual abuse.

3. Defendants made these accusations outside Old St. Mary's Church in Cincinnati, Ohio, in the presence of parishioners, and in telephone and in-person reports to the police.

4. Count I of this suit alleges defamation; Count Two alleges invasion of privacy through false-light publicity. In Count Three, plaintiff Kenneth Edge seeks damages for Defendants' subsequent intrusion upon his seclusion at the family's Cincinnati condominium.

## II. PARTIES

5. Plaintiff Kenneth Edge resides in Greene County, Ohio, at 171 E. Krepps Road, Xenia, Ohio 45385. He is the Chief Executive Officer of Infinity Labs. Kenneth Edge is domiciled in Ohio and is a citizen of Ohio.

6. Plaintiff Derrie Edge resides at the same address in Greene County, Ohio. She is married to Kenneth Edge. Derrie Edge is domiciled in Ohio and is a citizen of Ohio.

7. Plaintiff Andrew Edge is an adult residing at the same address in Greene County, Ohio. He is employed as a sales representative. Andrew Edge is domiciled in Ohio and is a citizen of Ohio.

8. Defendant Justin Klanke resides at 10583 Mountain Laurel Way, Union, Kentucky 41091, and is a physician. Justin Klanke is domiciled in Kentucky and is a citizen of Kentucky.

9. Defendant Katherine Klanke resides at the same address in Union, Kentucky. Katherine Klanke is domiciled in Kentucky and is a citizen of Kentucky.

10. Justin and Katherine Klanke are Adelyn Klanke's parents.

## III. JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000, exclusive of interest and costs, considering the compensatory and punitive damages sought by Plaintiffs.

12. This Court has general jurisdiction over each Defendant because all are domiciled in Kentucky.

13. Venue is proper under 28 U.S.C. § 1391(b)(1). One or all of the Defendants reside in this District, and all Defendants are residents of Kentucky.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiffs' Parish Community

14. The Edge family has attended Old St. Mary's Parish in Cincinnati since approximately September 2021. The Klanke family began attending the parish sometime between 2020 and 2022.

15. Old St. Mary's is a close-knit, traditional Catholic parish whose members maintain interconnected relationships throughout the Cincinnati and Northern Kentucky region.

16. Before the events alleged here, Kenneth and Derrie were respected parish members who regularly contributed their time, money, and services to the parish community.

17. Kenneth participated in the monthly men's Oratory meeting and established and led a boys' group for approximately two years. Derrie participated in the monthly women's Oratory meeting, coordinated social events after major feast days, and coordinated First Friday Adoration.

18. The Edge family was very active within their parish community. For example, they coordinated parish outings and an annual parish-wide procession,

participated in decorating activities, started and moderated an unofficial parish-wide email group, and hosted large parish gatherings at their farm attended by approximately seventy to three hundred parishioners.

19. The Edge family also purchased a condominium in Cincinnati's Over-the-Rhine neighborhood, approximately two blocks from the church.

20. Before May 2026, Plaintiffs understood their relationship with Defendants to be cordial and had no known prior disputes with them.

**B. Adelyn's Voluntary Stay**

21. Andrew and Adelyn met in approximately January 2023 during catechism classes. Their friendship developed into a romantic relationship, and they began dating in approximately July 2025.

22. Their relationship was known within portions of the parish community. Defendants objected to the relationship.

23. On May 22, 2026, Andrew met Adelyn in Florence, Kentucky, where she worked. They traveled to Newport for dinner with friends and later went to Dave & Buster's in Florence.

24. Defendants arrived at Dave & Buster's and demanded that Adelyn leave with them. Adelyn refused.

25. Andrew observed that it appeared that Defendant Justin Klanke positioned himself in a manner that prevented Adelyn from leaving. Adelyn requested that Andrew call 911 because she felt physically intimidated. Andrew called 911 at approximately 10:45 p.m.

26. Katherine took possession of Adelyn's cellphone. Defendants told Adelyn that they would leave "all her sh*t on the porch" and that she was being "kicked out" of their home.

27. Adelyn did not leave with Defendants. She did not want to return home. She initially planned to spend the night in her car.

28. Concerned for her safety, Andrew invited Adelyn to stay at the Edge-owned condominium in Cincinnati. She voluntarily accepted.

29. The next day, May 23, Andrew drove Adelyn to work at Burn Boot Camp in Union, Kentucky. After work, Andrew brought her to the Edge family residence in Xenia, Ohio.

30. At approximately 8:57 p.m. on May 23, Justin Klanke texted Andrew's parents, Kenneth and Derrie Edge, asking about Adelyn's whereabouts and safety. Kenneth responded at approximately 9:43 p.m. that Adelyn was safe. Justin Klanke answered that he needed to hear "directly" from Adelyn, and set a "deadline" of one hour. The Edges notified Adelyn that her parents had contacted them and had requested her to reply. Adelyn stated that she did not want to communicate with them.

31. After the hour had passed, the Klankes contacted Cincinnati police. The police conducted a welfare check at the Edge condominium. Kenneth told the officers that Adelyn was not there, that she was an adult, and that she was estranged from her parents. The officers left without further action.

32. While temporarily staying at Edge-owned properties between May 22 and May 28, Adelyn had access to a telephone, transportation, friends, family, employment, and the freedom to come and go. No Plaintiff restricted Adelyn's

movements, prevented her from communicating with Defendants, or instructed her not to contact them. During her stay, Adelyn continued working, attended church, and socialized with friends. Andrew drove her to work on multiple occasions.

33. At one point, Derrie Edge asked Adelyn whether she had another place to stay. Adelyn said she did not. The Edge family offered her temporary accommodation, including a guest house at the Xenia farm property where Adelyn stayed by herself.

34. Defendants retained Adelyn's cellphone from May 22 until May 25, when they returned it to her. At no time did the Plaintiffs confiscate, borrow, nor retain Adelyn's cell phone or in any way restrict her communications.

35. Adelyn returned to her parents' residence on May 28. She continues her relationship with Andrew and maintains positive relationships with members of the Edge family.

**C. Public Accusations at Old St. Mary's**

36. On May 24, 2026, at the request of Adelyn, Andrew and Adelyn attended St. Ignatius in Cincinnati rather than Old St. Mary's to avoid a confrontation with Defendants. They then returned to the Edge property in Xenia.

37. Kenneth and other Edge family members attended the 9:30 a.m. Mass at Old St. Mary's.

38. After Mass, at approximately 11:00 a.m., Justin and Katherine confronted Kenneth outside Old St. Mary's in the presence of parishioners. Approximately one hundred people were gathered in the general area, with approximately twelve in the immediate vicinity.

39. Katherine loudly shouted, “No, no, you have our daughter,” and “They have our daughter.”

40. Justin stated, “You are holding our daughter hostage,” and “You won’t let her talk to us.”

41. Justin also stated, “You are holding her without any phone, no communication,” and “Let her out of the building.”

42. Justin knew these statements were false. In fact, it was the Klankes, not the Edges, who had taken possession of Adelyn’s cell phone.

43. The statements outside the church were captured by church surveillance recordings. They were uttered loudly, and at times by shouting.

44. These statements were communicated to parishioners within hearing distance. Plaintiffs do not allege that every person gathered in the general area heard every statement.

45. In context, Justin’s statements asserted that the Edge family was unlawfully confining Adelyn and preventing her from communicating with her parents. Katherine’s statements, made during the same confrontation, reinforced the accusation that the Edge family had taken and was keeping Adelyn against her will.

46. The accusations of unlawful confinement and interference with Adelyn’s communications were false. Adelyn was an adult who had voluntarily accepted temporary accommodation, remained free to leave, continued working, and had access to a telephone and transportation.

47. In the context of the confrontation and the parties’ known relationships, the accusations concerning the Edge family referred to Kenneth and Derrie as the parents and property owners providing temporary accommodation, and to Andrew

as Adelyn's boyfriend who had invited her to stay and provided transportation. Plaintiffs allege that co-congregants and listeners familiar with those relationships reasonably understood the accusations to concern each of the three Plaintiffs.

**D. The 911 Call**

48. Immediately or shortly after the confrontation outside the church, Defendant Justin Klanke placed a 911 call to the police. He stated that a family from the same church was holding his daughter and that the situation was like "a hostage situation."

49. During the call, Justin stated that Adelyn was eighteen but had no phone and that the Edge family would not allow any communication with her parents.

50. Justin further told the dispatcher that the Edge family had a "history of sexual abuse," that Adelyn was disconnected from the world, and that the family had a history of manipulating "a young mind."

51. Justin also stated that the Edges had been "grooming" Adelyn with Andrew for approximately two years and that he believed they had taken Adelyn in as their own child after she turned eighteen.

52. Justin told the dispatcher that he did not want to make a false claim and that, if Adelyn willingly wanted to be with the Edges, he did not want to characterize the situation as an abduction. Nevertheless, he stated that Adelyn was "quite possibly" being held against her will.

53. The dispatch record initially classified the call as an abduction matter. The record later reflected "STILL INV, NO CRIME AT THIS TIME," and the classification was changed to "FAMTRB," or family trouble.

**E. Conduct at the Condominium**

54. Following the confrontation outside the church, Kenneth left with several of his minor children and headed toward the family's condominium.

55. Kenneth walked on Main Street rather than the family's usual route along Clay Street to avoid further confrontation with members of the Klanke family.

56. Justin proceeded along Main Street in the same direction as Kenneth and the children, toward the condominium.

57. At approximately 11:39 a.m., Kenneth arrived at the condominium. He observed Katherine arrive in a white Chevrolet Traverse and position her vehicle in a manner that blocked the rear vehicle exit. The parking lot at the condominium complex is private and gated. For his part, Justin stood at the front entrance to the parking lot.

58. At approximately 11:44 a.m., Kenneth Edge called 911 because he was concerned for his and his children's safety and believed Defendants were effectively entrapping them at the property.

59. Police arrived at approximately 11:54 a.m. Kenneth reported his observations and concerns. Kenneth informed the officers that Adelyn was not present and that he did not know her whereabouts. He further reported that Katherine had been blocking the rear gate and that he was concerned for the safety of himself and his family, believing that the Klankes were likely to escalate the situation. The responding officer recorded that Katherine was near the rear of the property but was not blocking the driveway or gate at the time the officer made that observation.

60. After approximately thirty minutes of discussion with police, Defendants left the area.

61. Two parishioners, Shawn Dansby and Charles Levine, came to the condominium from church. They observed Justin near the street entrance. They removed a pen that had been placed in a secured gate door, apparently to prevent it from fully closing.

62. The Defendants' pursuit and positioning at the entrances of the family's condominium, immediately after the public confrontation, intentionally interfered with Kenneth's private family activities and ability to retreat with his children into the security and seclusion of the residence.

**F. Katherine Klanke's Defamatory Statement**

63. Within one or two days after the confrontation, a fellow parishioner at Old St. Mary's informed Derrie that Katherine Klanke had stated to other parishioners that the Edge family had been "grooming" Adelyn for years and that Andrew was an alcoholic and drug user.

64. Based on this co-parishioner's report, Plaintiffs allege on information and belief that Katherine made that accusation to fellow parishioners on or about May 24, 2026. The exact time, recipients, and words used will be established through discovery.

**G. Statements to Police During Stop of Andrew**

65. On May 25, 2026, Andrew drove Adelyn to her workplace at the Florence Aquatic Center in Florence, Kentucky.

66. Justin and Katherine Klanke were completing a police report at the aquatic center before Andrew and Adelyn arrived.

67. At approximately 3:45 p.m., Andrew and Adelyn arrived at the parking lot and observed the Klanke parents. At Adelyn's request, Andrew left the parking lot in an effort to avoid Justin and Katherine.

68. Officers followed Andrew's vehicle and conducted a traffic stop at the nearby Michael's College of Hair Design in Florence, Kentucky.

69. Approximately five police vehicles surrounded Andrew's vehicle. Andrew was detained in the vehicle for more than thirty minutes before he was permitted to leave.

70. During the police stop, Katherine Klanke described the Edge property to the police officers as a "100-acre compound," and stated that the Edge family possessed "hundreds of guns."

71. Justin Klanke alluded to alleged human trafficking in Xenia and linked the Edge family to those concerns.

72. Justin claimed that religious sisters and priests had concerns about the Edge family.

73. At the end of the encounter, Justin admitted that his concerns about Adelyn's physical well-being were false. He told Adelyn, "We never thought you were in physical harm."

74. Andrew and Adelyn left together and went to dinner. Adelyn did not leave with Justin and Katherine.

75. Justin and Katherine returned Adelyn's phone to her after keeping it in their custody since the night of May 22, 2026.

76. Adelyn returned to live with her parents on May 28, 2026.

77. Adelyn continues to have contact with Andrew and the Edge family and maintains positive relationships with members of the Edge family, particularly Derrie and the younger Edge children.

**H. The Klankes' Defamatory Statements Were False**

78. The accusation of "grooming" conveyed that Plaintiffs had engaged in prolonged predatory manipulation rather than an ordinary friendship and consensual relationship. That portrayal was factual and false.

79. The accusation of "hostage" falsely portrayed a voluntary stay by an adult as coercive confinement, restriction of communications, and predatory conduct. The hostage and communication-restriction accusations described specific conduct capable of being proven true or false.

80. Defendants knew Adelyn had refused to leave with them on May 22, knew they had retained her cellphone, and had been informed by Kenneth that she was safe. Defendant Justin Klanke admitted that he knew Adelyn was never in physical danger. Defendants knew the coercive-confinement portrayal was false or subjectively entertained serious doubts about its truth and nevertheless publicly asserted it.

81. Defendants had no basis in fact to support their wild statements to the police. Plaintiffs have no history of sexual abuse, nor have they ever been accused by anyone of sexual abuse or of possessing an inordinate number of firearms at their rural farm property. Defendants knew these statements were false or were reckless as to their truth.

82. By making loud accusations outside a church immediately after Sunday Mass, in the presence of a large gathering within an interconnected community,

Defendants gave publicity to the false portrayal of Plaintiffs. Plaintiffs allege that the manner, location, audience, and accompanying communications made the accusations substantially certain to become public knowledge within that community.

83. By making their false statements to the police, the Defendants publicized their defamatory statements to third persons.

## I. Resulting Harm

84. Defendants' numerous and public accusations injured Plaintiffs' reputations and relationships in the Old St. Mary's community and exposed them to suspicion, humiliation, and disgrace.

85. Kenneth experienced significant anxiety, stress, and loss of sleep. Church events and parish activities that had been sources of peace became sources of anxiety.

86. Derrie experienced substantial emotional distress, anxiety, loss of sleep, and feelings of helplessness. Attending church became stressful, and she worried about the effect of the accusations on her family's relationships and standing in the parish.

87. Andrew experienced substantial stress and anxiety, became increasingly withdrawn, and suffered a decline in work performance that his supervisor observed and discussed with him on multiple occasions.

88. Each Plaintiff seeks recovery for that Plaintiff's own injuries. The minor Edge children are not parties, and Plaintiffs do not seek separate damages belonging to those children.

**COUNT I — DEFAMATION, INCLUDING SLANDER PER SE (All Plaintiffs Against Justin Klanke and Katherine Klanke)**

89. Plaintiffs incorporate and fully re-allege all above paragraphs.

90. Justin published the false statements described above to parishioners and other persons outside Old St. Mary's, and to the police. Katherine published the statements described above to parishioners and, on information and belief, published the grooming accusation.

91. Each Defendant is liable for the statements that Defendant made. Plaintiffs do not allege liability merely because Defendants are married or were present together.

92. The statements were of and concerning Plaintiffs. The publications portrayed Plaintiffs as unlawfully holding Adelyn and engaging in coercive or predatory conduct, and of a history of sexual abuse and other threatening or malicious behavior.

93. The accusations were false and defamatory. They injured Plaintiffs' reputations and exposed them to hatred, contempt, shame, disgrace, and distrust within their community.

94. The accusations that Plaintiffs were holding Adelyn hostage, grooming her, involved in sexual abuse, and even involved in human trafficking, together with Defendants' other statements, imputed serious criminal conduct involving moral turpitude or infamous punishment and constitute slander per se. Plaintiffs seek presumed damages to the extent permitted by applicable law, as well as damages for the actual injuries alleged here.

95. Katherine's statements, considered in the context in which they were made, falsely reinforced the accusation of involuntary detention and falsely portrayed Plaintiffs as predators who had manipulated Adelyn over a period of years.

96. Each Defendant acted negligently and maliciously in communicating the statements attributed to that Defendant. Each Defendant also acted with actual malice, aware of, or acting in reckless disregard of, the falsity of the statements that Defendant made.

97. The false and defamatory statements made to the police were made maliciously and in bad faith. The Defendants knew their statements were false and made them with ill-will and malice.

98. As a direct and proximate result of the respective publications, each Plaintiff suffered reputational injury, humiliation, emotional distress, personal physical injuries and the other individual injuries, in amounts to be determined at trial.

**COUNT II — INVASION OF PRIVACY: FALSE LIGHT (All Plaintiffs Against Justin Klanke and Katherine Klanke)**

99. Plaintiffs incorporate and fully re-allege all above paragraphs.

100. Defendants' false statements gave publicity to matters concerning Plaintiffs that placed the Plaintiffs before the public in a false light as persons who confined an adult against her will, cut her off from communications, and subjected her to predatory manipulation. Defendants also characterized Plaintiffs falsely as having a history of sexual abuse, and of harboring hundreds of firearms at their "compound."

101. The Defendants ensured their false accusations would gain publicity by their loud public confrontation after Mass, before a sizable gathering in the immediate vicinity, the interconnected parish community, and Katherine's

additional communications to parishioners. These circumstances made the false portrayal substantially certain to become public knowledge.

102. The Defendants' false statements to the police were made part of police reports accessible to members of the public upon request.

103. The false portrayal would be highly offensive to a reasonable person because it attributes serious coercive and predatory misconduct to Plaintiffs.

104. Each Defendant knew, or acted in reckless disregard of, the falsity of the matter that Defendant publicized and the false light in which Plaintiffs would be placed.

105. As a direct and proximate result, each Plaintiff suffered injury to personal dignity and peace of mind, humiliation, emotional distress, and the individual injuries described above.

106. Plaintiffs assert this count as an alternative or additional theory of recovery and do not seek duplicate compensation for a single injury or instance of publicity.

**COUNT III — INVASION OF PRIVACY: INTRUSION UPON SECLUSION**

**(Kenneth Edge Against Justin Klanke and Katherine Klanke)**

107. Kenneth incorporates and fully re-alleges all above paragraphs.

108. Kenneth had a reasonable expectation of solitude and seclusion in the family's condominium and in his private family activities there.

109. Following the public confrontation, Justin intentionally followed Kenneth and his minor children toward the condominium and positioned himself near its front entrance. Katherine intentionally arrived at the rear of the property and positioned her vehicle to block egress from the private parking lot.

110. These acts intruded physically or otherwise upon Kenneth's seclusion by surrounding the entrances to the residence and interfering with his ability to withdraw into private family life after the confrontation.

111. The intrusion was highly offensive to a reasonable person because it followed public accusations of serious criminal conduct, occurred while Kenneth was seeking refuge with his minor children, and created an objectively reasonable concern that Defendants would escalate the confrontation at the residence.

112. As a direct and proximate result, Kenneth suffered anxiety, fear, mental suffering, and interference with the peace and security of his private family activities, in amounts to be determined at trial.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against the respective liable Defendant or Defendants as follows:

A. Compensatory damages for each Plaintiff's proven injuries, in amounts determined at trial;

B. Presumed damages for actionable defamation per se to the extent permitted by law;

C. Punitive damages;

D. Reasonable attorney's fees to the extent recoverable;

E. Costs and prejudgment and postjudgment interest as permitted by law; and

F. Such other relief as the Court deems just and proper.

## VI. JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

***/s/ Todd V. McMurtry***
Todd V. McMurtry
The McMurtry Law Firm, PLLC
405 Garrard Street, Suite 204
Covington, KY 41011
(859) 999-1074
todd@mcmurtry-law.com